1

2

3

4

5

6

7

8                        **UNITED STATES DISTRICT COURT**

9                        **EASTERN DISTRICT OF CALIFORNIA**

10

11    HENDRIX MORENO MONTECASTRO,        )    Case No.: 1:20-cv-00689-SAB (PC)
                                         )
12                  Plaintiff,           )
                                         )    ORDER DIRECTING CLERK OF COURT TO
13          v.                           )    RANDOMLY ASSIGN A DISTRICT JUDGE TO
                                         )    THIS ACTION
14    NEWSOM, *et al.*,                  )
                                         )    FINDINGS AND RECOMMENDATIONS
15                  Defendants.          )    RECOMMENDING DISMISSAL OF ACTION
                                         )    FOR FAILURE TO PROSECUTE, FAILURE TO
16                                       )    COMPLY WITH A COURT ORDER, AND
                                         )    FAILURE TO STATE A COGNIZABLE CLAIM
17                                       )    FOR RELIEF
                                         )
18                                       )    (ECF Nos. 6, 7)

19          Plaintiff Hendrix Moreno Montecastro is proceeding *pro se* and *in forma pauperis* in this civil

20   rights action pursuant to 42 U.S.C. § 1983.  This matter was referred to a United States Magistrate

21   Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

22                                          **I.**

23                                     **BACKGROUND**

24          Plaintiff filed the instant action on May 18, 2020.  (ECF No. 1.)

25          On August 25, 2020, the Court screened Plaintiff's complaint, found no cognizable claims, and

26   granted Plaintiff leave to file an amended complaint within thirty days.  (ECF No. 6.)  However,

27   Plaintiff did not file an amended complaint or otherwise communicate with the Court.  Therefore, on

28

                                             1

1    October 14, 2020, the Court issued an order for Plaintiff to show cause within fourteen days why the

2    action should not be dismissed for failure to prosecute, failure to comply with a court order, and

3    failure to state a cognizable claim for relief.  (ECF No. 7.)  Plaintiff has not responded to the order to

4    show cause and the time to do so has passed.  Accordingly, dismissal of the action is warranted.

5                                                              **II.**

6                                              **SCREENING REQUIREMENT**

7            The Court is required to screen complaints brought by prisoners seeking relief against a

8    governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  The

9    Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally

10   "frivolous or malicious," that "fail[] to state a claim on which relief may be granted," or that "seek[]

11   monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B).

12           A complaint must contain "a short and plain statement of the claim showing that the pleader is

13   entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  Detailed factual allegations are not required, but

14   "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,

15   do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly,

16   550 U.S. 544, 555 (2007)).  Moreover, Plaintiff must demonstrate that each defendant personally

17   participated in the deprivation of Plaintiff's rights.  Jones v. Williams, 297 F.3d 930, 934 (9th Cir.

18   2002).

19           Prisoners proceeding *pro se* in civil rights actions are entitled to have their pleadings liberally

20   construed and to have any doubt resolved in their favor.  Wilhelm v. Rotman, 680 F.3d 1113, 1121

21   (9th Cir. 2012) (citations omitted).  To survive screening, Plaintiff's claims must be facially plausible,

22   which requires sufficient factual detail to allow the Court to reasonably infer that each named

23   defendant is liable for the misconduct alleged.  Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service,

24   572 F.3d 962, 969 (9th Cir. 2009).  The "sheer possibility that a defendant has acted unlawfully" is not

25   sufficient, and "facts that are 'merely consistent with' a defendant's liability" falls short of satisfying

26   the plausibility standard.  Iqbal, 556 U.S. at 678; Moss, 572 F.3d at 969.

27   ///

28   ///

                                                               2

### III.

### COMPLAINT ALLEGATIONS

Over the course of the past two decades a history of serious danger, overcrowding, and an excessive increase in violence has emerged in the State of California Prisons.  A large part of this epidemic is prisoner double bunking which is the primary source of all obstacles that manifest through overcrowding living conditions, such as: (1) treacherous living conditions as imminent danger (from overcrowding), as inmates beat, attack and even kill each other living space; (2) noise levels so profound that inmates consider committing suicide, fight, riot, attack, and suffer mental infliction; (3) double bunking inmates, creates invasions of space, constant disturbance, shaking, movements that trigger hostility, anger, fights, riots, attacks, suicide, killings, and murders.  It is also mental, emotional, stress and anxiety, profound depression and psychological pain and suffering for long periods of time; (4) double bunking inmates is the sole reason or prison and jail overcrowding.  In fact the State of California are overcrowded based on double bunking inmates vertically; (5) double bunking manifests overcrowding, which in turn creates lack of adequate medical care and mental health for prison inmates due to the sheer volume of population, where under qualified medical staff cannot meet the medical and mental health needs of the whole population; (6) double bunking of inmates creates unsafe living conditions, where prison order cannot be maintained by the correctional officers in California.  Because of the overcrowding, officials rely on having "shot caller" inmates regulate other inmates for disciplinary purposes, such as beating inmates, attacking inmates, bullying inmates, using duress and fear, murder and killings; and (7) double bunking inmates in California creates overcrowding and causes a serious and significant increase in violence.

Prison inmates, mainly lifer and long sentence inmates, are more prone to violence and are the ones that mostly trigger major fights, attacks, riots and manifest a dangerous atmosphere for the entire population.

One of the main points in inmate to inmate violence is directly related to top bunk inmates that get up and down the bunk constantly, shaking the bunk (waking up bottom bunk inmate) movements that disturbs the inmate on the bottom, moving and shaking the bunk from the top, that causes coffee, food and things to drop and spill.  This frustrates inmates because it is never ending.  It also causes

1  lack of living space, where two inmates occupy the same space at the same time, this is the number

2  one cause of violence.

3          Inmates on the top bunks tend to get up and down a lot, they jump down for food, water, to use

4  the restroom, to look in their lockers, to move around, and the nonstop movement that overwhelms the

5  bottom bunk inmate.

6          The top bunks are hazardous because there are no ladders to climb up the bunk.  There are no

7  adequate handholds or rails to grip for going up and jumping down from the top bunk.  The only way

8  inmates can get up a bunk is to step on a small foot hold on the end of the bunk which is slippery and

9  small and for only one foot.  Another way is to stand on top of the bottom bunk and climb up that way.

10  Inmate wars result from standing on the bottom bunk.  While the inmate is trying to get on the top

11  bunk, the bunk is shaking, moving, and creates a frustration to the inmate on the bottom.  When the

12  top bunk inmate jumps down (all inmates must leap-jump off the top bunk, that is the only way down),

13  which creates a loud sound and annoys the bottom bunk inmate and surrounding inmates.  This

14  process is every single day, all day and night.

15          While the top bunk inmate tries to get down, there are no hand-rails, handholds, ladder or

16  foothold that can be reached.  To get down the inmate must fully commit to the jump and hope he

17  lands right or he suffers injury.  Eighty percent of inmates report they had a top bunk injury.

18          Over seventy-five percent of the inmate population has made medical requests for bottom bunk

19  chronos due to injuries or problems getting up and down the top bunk.  Seventy-five percent of the

20  above inmates are systematically denied bottom bunk chronos who are forced despite their problem or

21  medical injuries.  The denials are systematic because of overcrowding and there are not enough

22  bottom bunks.

23          Jumping down from a bunk can and usually does cause medical problems to the bones, feet,

24  hips, knees, ankles, and back.   Because of the process of getting up and down the top bunks without

25  handholds inmates also suffer injuries to their hands, elbows, and shoulders, especially inmates over

26  the age of 40.

27          Governor Newsom and Diaz have a practice of clearing the top bunks of an institution, and

28  shifting inmates from prison to prison or suspend in transit while the federal court special master

4

1   performs population counts, counting only the inmates on bottom bunks, because the top bunk inmates

2   are shifted or suspended.  After the count is performed, the inmates are then immediately filled back

3   into the top bunks, while the next prison for inspection does the same.

4           It is evidenced by the California Department of Corrections and Rehabilitation (CDCR) policy

5   to clear the top bunks for inspections and counts, that top bunk inmates are the cause of overcrowding

6   and CDCR and Governor Newsom realize it and that is why they shift and suspend only top bunk

7   inmates.

8           On August 30, 2018, all the top bunks were vacant at the California Correctional Institution,

9   and the population was approximately 400 inmates.  There was no violence, overcrowding or

10  problems related to any of the above issues, including better medical care and treatment.  The officers

11  were telling inmates: "DON'T GET USED TO THIS KIND OF LIVING, SOON EVERYBODY

12  WILL BE BACK, AFTER THE FEDS DO THEIR COUNT, ALL THE TOP BUNKS WILL BE

13  FILLED."  Upon hearing the news that the top bunks would all be filed, inmates were complaining,

14  stressing and having anxiety about who would be their cellmate.  When the inmate top bunks were

15  filled, the violence, harassment, excessive force, fights, attacks, assaults and inadequate medical care

16  all returned.

17          Medical facilities at all prisons are underqualified and lack adequate credentials to treat and

18  diagnose most inmates medical conditions.  Over seventy percent of the inmate population is denied

19  adequate medical care.  Inmates with known medical conditions are denied bottom bunk chronos even

20  if necessary, because CDCR informed medical to top the bottom bunk chronos because there is not

21  enough bunks.  Thereby, medical providers ignore the medical needs of thousands of inmates that

22  need bottom bunk status, and are forced to live on top bunks causing pain and suffering.

23          Inmates in hallways, outside, in cells, in dorms, or anywhere in the facility are excessively

24  loud.  When inmates are crowded together, they must speak louder over the other inmates because the

25  noise levels are so high.  The officers scream for silence which never works.

26          There is an underground policy because of the double bunking overcrowding in which officers

27  use excessive force, fear, duress, threats, physical abuse, assault and violence as discipline.  Officers

28

1  will ransack inmates property to pay for the mishap of another inmate which causes innocent inmates

2  to lose property and suffer punishment for someone else's problems.

3        Because of double bunk overcrowding, CDCR classification committees deny programs to

4  thousands of inmates that are required to participate in specific programs by the Board of Parole

5  Hearings (BPH).  Based on overcrowding it takes months and even years to get into rehabilitative

6  programs to comply with the BPH demands for early release on parole.

7        Plaintiff seeks declaratory relief and a permanent injunction abolishing all top bunks in the

8  entire State of California.

9                                              **IV.**

10                                       **DISCUSSION**

11     **A.      Overcrowding-Double Bunking**

12        Plaintiff contends that double bunking creates unconstitutional crowding in violation of the

13  Eighth Amendment.

14        "The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners

15  not only from inhumane methods of punishment but also from inhumane conditions of confinement."

16  Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006). However, the Eighth Amendment does

17  not "mandate comfortable prisons" that are "free of discomfort." Rhodes v. Chapman, 452 U.S. 337,

18  349 (1981). "To the extent that [prison] conditions are restrictive and even harsh, they are part of the

19  penalty that criminal offenders pay for their offenses against society." Id. at 347. The Eighth

20  Amendment does proscribe the "unnecessary and wanton infliction of pain," which includes those

21  sanctions that are "so totally without penological justification that it results in the gratuitous infliction

22  of suffering." Gregg v. Georgia, 428 U.S. 153, 173, 183 (1976). This includes not only physical

23  torture, but any punishment incompatible with "the evolving standards of decency that mark the

24  progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (internal quotations and

25  citations omitted).

26        To prevail on an Eighth Amendment claim for deprivation of humane conditions of

27  confinement, a prisoner must satisfy two requirements: one objective and one subjective.  Farmer v.

28  Brennan, 511 U.S. 825, 834 (1994).  Under the objective requirement, the prison official's acts or

1    omissions must be objectively, sufficiently serious and result in the denial of the minimal civilized

2    measure of life's necessities. Id. (internal citations and quotations omitted). In this regard, "prison

3    officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must

4    take reasonable measures to guarantee the safety of the inmates." Id. at 832 (internal quotations and

5    citations omitted).

6         Under the subjective component, a prison official must have a "sufficiently culpable state of

7    mind." Farmer, 511 U.S. at 834. "[T]hat state of mind is one of 'deliberate indifference' to inmate

8    health or safety." Id. "Deliberate indifference" exists when a prison official "knows of and disregards

9    an excessive risk to inmate health or safety; the official must both be aware of facts from which the

10   inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

11   inference." Id. at 837. Conversely, "prison officials who actually knew of a substantial risk to inmate

12   health or safety may be found free from liability if they responded reasonably to the risk, even if the

13   harm ultimately was not averted." Id. at 844.  In addition, "a factfinder may conclude that a prison

14   official knew of a substantial risk from the very fact that the risk was obvious." Id. at 842.

15        In Rhodes v. Chapman, 452 U.S. 337, 348 (1981), the Supreme Court held that double-celling

16   prison inmates is not a violation of the Eighth Amendment. The inmates in Rhodes v. Chapman filed

17   suit seeking an injunction because "double celling confined cellmates too closely" and caused

18   overcrowding of the prison. Id. at 340. Based on "extensive findings of fact" in the record, the

19   Supreme Court concluded that double celling of inmates did not lead to conditions that violated the

20   Eighth Amendment, such as the unnecessary infliction of pain; a deprivation of "essential food,

21   medical care, or sanitation;" or the creation of "other conditions intolerable for prison confinement."

22   Id. at 348-350.

23        As an initial matter, the Court notes that the existence of orders to reduce prison overcrowding

24   does not give rise to a claim, as overcrowding, by itself, is not a constitutional violation. Doty v.

25   County of Lassen, 37 F.3d 540, 545 n.1 (9th Cir. 1994); Hoptowit v. Ray, 682 F.2d 1237, 1249 (9th

26   Cir. 1982). Moreover, Plaintiff can only litigate this action on his own behalf, as he lacks standing to

27   assert the constitutional rights of others. See Halet v. Wend Inv. Co., 672 F.2d 1305, 1308 (9th

28   Cir.1982) (stating that a party must assert his own rights, not those of third parties) (citing Duke Power

1  Co. v. Carolina Envtl Study Group, 438 U.S. 59, 80 (1978) ); Warth v. Seldin, 422 U.S. 490, 499

2  (1974) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the

3  complaining party, even though the court's judgment may benefit others collaterally. A federal court's

4  jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or

5  actual injury resulting from the putatively illegal action....' ").

6        Furthermore, allegations of prison overcrowding alone are insufficient to state a claim under

7  the Eighth Amendment. See Balla v. Idaho State Bd. of Corr., 869 F.2d 461, 471 (9th Cir. 1989); see

8  also Rhodes v. Chapman, 452 U.S. at 348-49 (double-celling of inmates by itself does not inflict

9  unnecessary or wanton pain or constitute grossly disproportionate punishment in violation of Eighth

10  Amendment). An overcrowding claim is cognizable only if the plaintiff alleges that crowding has

11  caused an increase in violence, has reduced the provision of other constitutionally required services, or

12  has reached a level rendering the institution no longer fit for human habitation. See Balla, 869 F.2d at

13  471; Hoptowit v. Ray, 682 F.2d at 1248-49 (noting that overcrowding itself not Eighth Amendment

14  violation but can lead to specific effects that might violate Constitution), abrogated in part on other

15  grounds by Sandin v. Conner, 515 U.S. 472 (1995).

16        Plaintiff has failed to allege particularized injuries allegedly stemming from overcrowding, and

17  his allegations about the overcrowding itself are conclusory and insufficient to state a claim. See, e.g.,

18  Akao v. Shimoda, 832 F.2d 119, 120 (9th Cir. 1987) (per curiam) (as amended) (reversing district

19  court's dismissal of claim that overcrowding caused increased stress, tension, and communicable

20  disease among inmate population); Toussaint v. Yockey, 722 F.2d 1490, 1492 (9th Cir. 1984)

21  (affirming that Eighth Amendment violation may occur as result of overcrowded prison conditions

22  causing increased violence, tension, and psychiatric problems).  Specifically, although Plaintiff

23  contends that Governor Newsom and Diaz have a practice of clearing the top bunks of an institution,

24  and shifting inmates from prison to prison or suspend in transit while the federal court special master

25  performs population counts, he fails to state any particularized allegations about how the prison's

26  overcrowding has had a specific impact on him.  Indeed, Plaintiff does not explain whether he was in a

27  cell that was over capacity or was deprived of any services because of overcrowding.  Therefore, his

28  overcrowding claim fails. See Balla, 869 F.2d at 471; Rounds v. Woodford, No. CIV S-05-0555 GEB

1    GGH P., 2009 WL 1657462, at *2-3 (E.D. Cal. June 12, 2009) (finding that plaintiff failed to "plead

2    specific facts demonstrating that overcrowding has caused him to be exposed to unhygienic

3    conditions" and that allegations that overcrowding made him feel "stress, tension, and unsafe" were

4    insufficient "for the court to reasonably infer that defendant is liable"); Valdespino v. Brewer, No. CV

5    13-01528-PHX-DGC (MEA), 2014 WL 1875120, at *5 (D. Ariz. May 9, 2014) (finding that plaintiff

6    did not state overcrowding claim when he "fail[ed] to assert approximately when and for how long he

7    was subjected to overcrowded and understaffed conditions"); see also Latimer v. Kolender, No.

8    05cv2090 JM(JMA)., 2008 WL 2326305, at *5 (S.D. Cal. June 3, 2008) (noting that "[g]eneralized

9    conclusory allegations of overcrowding ... are insufficient to state a claim").

10          Nor are Plaintiff's allegations sufficient to indicate that prison officials ignored an obvious risk

11   to his health or safety or that prison officials had knowledge of a substantial risk to plaintiff's health or

12   safety but failed to take reasonable measures to protect plaintiff.  In other words, Plaintiff's mere

13   reference to prior incidents of violence in prison is not enough to support an Eighth Amendment

14   claim.

15          Lastly, to the extent Plaintiff contends that Defendants have failed to remedy overcrowding

16   pursuant to remedial orders issued in the class actions Armstrong and Plata, his claim fails. See Brown

17   v. Plata, 563 U.S. 493 (2011); Armstrong v. Davis, 58 Fed. App'x 695 (9th Cir. 2003).  The remedial

18   decrees do not create independent causes of action. "[R]emedial orders ... do not create 'rights,

19   privileges or immunities secured by the Constitution and the laws' of the United States." Hart v.

20   Cambra, No. C-96-0924-SI, 1997 WL 564059, *5 (N.D. Cal. Aug. 22, 1997) (quoting Green v.

21   McKaskle, 788 F.2d 1116, 1123–24 (5th Cir. 1986) ). Thus, Plaintiff is not entitled to relief for the

22   alleged violation of Plata.  Further, this Court cannot issue relief to Plaintiff under Armstrong. "[A]ny

23   violations of the remedial plan developed in Armstrong do not provide an independent basis for relief

24   in this court. Violations of the Armstrong Remedial Plan must be addressed *through the procedures*

25   *provided by that plan.*" Prado v. Swarthout, No. 2:15-cv-1866-WBS-DS-P, 2017 WL 1106007, *10

26   n.1 (E.D. Cal. Mar. 24, 2017) (emphasis added); see also Crayton v. Terhune, No. C 98-4386-CRB-

27   PR, 2002 WL 31093590, at *4 (N.D. Cal. Sept. 17, 2002).  Any alleged violations of the Remedial

28   Plan must be addressed through the procedures provided in Armstrong. See Frost v. Symington, 197

9

1    F.3d 348, 358–59 (9th Cir. 1999). Accordingly, Plaintiff also fails to state claim based on the

2    Armstrong remedial decree regarding prison overcrowding.

3           **B.      Inadequate Medical Treatment**

4           Plaintiff also attributes a lack of medical care and treatment to the overcrowding of the prisons.

5    However, Plaintiff's allegations are conclusory in nature.  For instance, Plaintiff alleges "that double

6    bunking inmates manifests a overcrowding crisis, and because of the overcrowding of inmates and

7    lack of adequate medical resources due to the large amount of inmates that resources are exhausted,

8    creating inadequate medical care and mental health is inadequate also." (Compl. at 15.)   Plaintiff

9    further alleges that "[i]nmates with known medical conditions are denied bottom bunk chronos even

10   were [sic] it is necessary, because CDCR informed medical to stop the bottom bunk chronos because

11   there is not enough bottom bunks." (Id.)  However, Plaintiff fails to allege or demonstrate specific

12   facts as to how the overcrowding by double bunking has led to the lack of medical care for him.  More

13   importantly, Plaintiff has failed to show that any prison official disregarded an excessive risk to his

14   health and/or safety by double bunking.  Simply stated, Plaintiff does not connect the overcrowding to

15   the failure to provide medical care.  Plaintiff's conclusory statements that overcrowding results in

16   deficiencies in health care are insufficient. In addition, Plaintiff failed to plead that a policy or action

17   on the part of CDCR in response to crowding resulted in deliberate indifference.  Accordingly,

18   Plaintiff fails to state a cognizable claim for deliberate indifference to a serious medical need.

19          **C.      Excessive Noise**

20          To the extent Plaintiff is seeking to state a claim based upon the alleged excessive noise due to

21   double bunking, Plaintiff fails to state a cognizable claim.

22          The Ninth Circuit has held that public conceptions of decency inherent in the Eighth Amendment

23   require that inmates be housed in an environment that, if not quiet, is at least reasonable free of

24   excessive noise.  Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996), amended 135 F.3d 1318

25   (quoting Toussaint v. McCarthy, 597 F.Supp. 1388, 1397, 1410 (N.D. Cal. 1984), aff'd in part, rev'd

26   in part on other grounds, 801 F.2d 1080, 1110 (9th Cir. 1986).

27          However, for excessive noise to be cognizable under the Eighth Amendment, "it 'must either

28   significantly exceed, or be independent of, the inherent discomforts of confinement.' " Endsley v.

1  Luna, 750 F. Supp. 2d 1074, 1100 (C.D. Cal. 2010) (quoting Demery v. Arpaio, 378 F.3d 1020, 1030

2  (9th Cir. 2004)).  Here, Plaintiff has not present specific factual allegations to find that the noise level

3  is "excessive."  Plaintiff has only broadly alleged "[i]nmates in hall ways, outside, in the cells, in the

4  dorms, or anywhere inmates are allowed to be, are excessively loud, such much [sic] that inmates

5  compete for noise levels[.]"  (Compl. at 17.) Plaintiff has not stated how often the noise occurred, nor

6  that it is constant, or the specific impact it has caused on him.  Thus, the Court cannot find that the

7  noise is "excessive" and therefore, Plaintiff has not alleged the noise level violates his constitutional

8  rights. Keenan v. Hall, 83 F.3d at 1091.  In sum, Plaintiff has not presented sufficient facts to support

9  his assertion that the noise levels constitute punishment, therefore Plaintiff has not sufficiently stated

10  an Eighth Amendment violation.

11         **D.**      **Retaliation**

12         "Prisoners have a First Amendment right to file grievances against prison officials and to be free

13  from retaliation for doing so." Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing Brodheim

14  v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)).  "Within the prison context, a viable claim of First

15  Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse

16  action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4)

17  chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably

18  advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).  To

19  state a cognizable retaliation claim, Plaintiff must establish a nexus between the retaliatory act and the

20  protected activity. Grenning v. Klemme, 34 F.Supp.3d 1144, 1153 (E.D. Wash. 2014).  Mere verbal

21  harassment or abuse does not violate the Constitution and, thus, does not give rise to a claim for relief

22  under 42 U.S.C. § 1983. Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987).  In addition,

23  threats do not rise to the level of a constitutional violation. Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir.

24  1987).

25         Although Plaintiff contends that he was retaliated against, he has failed to demonstrate a "but-

26  for" causal nexus between the alleged retaliation and any constitutionally protected activity.

27  Accordingly, Plaintiff fails to state a cognizable retaliation claim.

28  ///

11

1

### E.      Injunctive Relief

2      As to Plaintiff's request for the statewide prevention of double bunking, Plaintiff lacks

3  standing to seek such relief on behalf of other prisoners. <u>Mayweathers v. Hickman</u>, No. 05cv713

4  WQH (CAB), 2008 WL 4206822, at *8 (S.D. Cal. May 16, 2008); <u>see, e.g.</u>, <u>Spencer v. Hernandez</u>,

5  No. 08-CV-0416-JM (JMA), 2009 WL 331007, at *8 (S.D. Cal. Feb. 9, 2009) (finding that the inmate

6  plaintiff lacked standing to seek an injunction ordering that cameras be installed "anywhere a

7  corrections officer might be able to 'hurt someone' "). Accordingly, the Court finds that Plaintiff fails

8  to show that he would be entitled to injunctive relief even if he had asserted a viable cause of action.

9

### F.      Declaratory Relief

10      Plaintiff seeks a declaratory judgment that his rights were violated. "A declaratory judgment,

11  like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised

12  in the public interest." <u>Eccles v. Peoples Bank of Lakewood Village</u>, 333 U.S. 426, 431 (1948).

13  "Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and

14  settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty

15  and controversy faced by the parties." <u>United States v. Washington</u>, 759 F.2d 1353, 1357 (9th Cir.

16  1985).

17      In the event that this action reaches trial and the jury returns a verdict in favor of Plaintiff, that

18  verdict will be a finding that Plaintiff's constitutional rights were violated. Accordingly, a declaration

19  that any Defendant violated Plaintiff's constitutional rights is unnecessary.

20

### V.

21

### FAILURE  TO OBEY COURT ORDER AND FAILURE TO PROSECUTE

22      Here, the Court screened Plaintiff's second amended complaint, and on August 25, 2020, an

23  order issued providing Plaintiff with the legal standards that applied to his claims, advising him of the

24  deficiencies that needed to be corrected, and granting him leave to file an amended complaint within

25  thirty days. (ECF No. 6.) Plaintiff did not file a third amended complaint or otherwise respond to the

26  Court's August 25, 2020 order. Therefore, on October 14, 2020, the Court ordered Plaintiff to show

27  cause within fourteen (14) days why the action should not be dismissed. (ECF No. 7.) Plaintiff failed

28  to respond to the October 14, 2020 order.

1      Local Rule 110 provides that "[f]ailure of counsel or of a party to comply with these Rules or

2   with any order of the Court may be grounds for imposition by the Court of any and all sanctions . . .

3   within the inherent power of the Court."   The Court has the inherent power to control its docket and

4   may, in the exercise of that power, impose sanctions where appropriate, including dismissal of the

5   action.  Bautista v. Los Angeles County, 216 F.3d 837, 841 (9th Cir. 2000).

6      A court may dismiss an action based on a party's failure to prosecute an action, failure to obey

7   a court order, or failure to comply with local rules.  See, e.g. Ghazali v. Moran, 46 F.3d 52, 53-54 (9th

8   Cir. 1995) (dismissal for noncompliance with local rule); Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61

9   (9th Cir. 1992) (dismissal for failure to comply with an order to file an amended complaint); Carey v.

10  King, 856 F.2d 1439, 1440-41 (9th Cir. 1988) (dismissal for failure to comply with local rule requiring

11  pro se plaintiffs to keep court apprised of address); Malone v. United States Postal Serv., 833 F.2d 128,

12  130 (9th Cir. 1987) (dismissal for failure to comply with court order); Henderson v. Duncan, 779 F.2d

13  1421, 1424 (9th Cir. 1986) (dismissal for lack of prosecution and failure to comply with local rules).

14      "In determining whether to dismiss an action for lack of prosecution, the district court is required

15  to consider several factors: '(1) the public's interest in expeditious resolution of litigation; (2) the court's

16  need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring

17  disposition of cases on their merits; and (5) the availability of less drastic sanctions.' "  Carey, 856 F.2d

18  at 1440 (quoting Henderson, 779 F.2d at 1423).  These factors guide a court in deciding what to do, and

19  are not conditions that must be met in order for a court to take action.  In re Phenylpropanolamine (PPA)

20  Products Liability Litigation, 460 F.3d 1217, 1226 (9th Cir. 2006) (citation omitted).

21      In this instance, the public's interest in expeditious resolution of the litigation and the Court's

22  need to manage its docket weigh in favor of dismissal.  In re Phenylpropanolamine (PPA) Products

23  Liability Litigation, 460 F.3d at 1226.  Plaintiff was ordered to file an amended complaint and within

24  thirty days of August 25, 2020 and has not done so.  Accordingly, the operative pleading is the May 18,

25  2020 complaint which has been found not to state a cognizable claim.  Plaintiff's failure to comply with

26  the order of the Court by filing an amended complaint hinders the Court's ability to move this action

27  towards disposition.  This action can proceed no further without Plaintiff's compliance with the order

28  and his failure to comply indicates that Plaintiff does not intend to diligently litigate this action.

13

1    Since it appears that Plaintiff does not intend to litigate this action diligently there arises a

2  rebuttable presumption of prejudice to the defendants in this action.  In re Eisen, 31 F.3d 1447, 1452-53

3  (9th Cir. 1994).  The risk of prejudice to the defendants also weighs in favor of dismissal.

4    The public policy in favor of deciding cases on their merits is greatly outweighed by the factors

5  in favor of dismissal.  It is Plaintiff's responsibility to move this action forward.  In order for this action

6  to proceed, Plaintiff is required to file an amended complaint curing the deficiencies in the operative

7  pleading.  Despite being ordered to do so, Plaintiff did not file an amended complaint or respond to the

8  order to show cause and this action cannot simply remain idle on the Court's docket, unprosecuted.  In

9  this instance, the fourth factor does not outweigh Plaintiff's failure to comply with the Court's orders.

10    Finally, a court's warning to a party that their failure to obey the court's order will result in

11  dismissal satisfies the "consideration of alternatives" requirement.  Ferdik, 963 F.2d 1262; Malone,

12  833 F.2d at 132-33; Henderson, 779 F.2d at 1424.  The Court's August 25, 2020 order requiring

13  Plaintiff to file an amended complaint expressly stated: "If Plaintiff fails to file an amended complaint

14  in compliance with this order, the Court will recommend to a district judge that this action be

15  dismissed consistent with the reasons stated in this order." (ECF No. 6.)  In addition, the Court's

16  October 14, 2020, order to show cause specifically stated: "Plaintiff is warned that failure to comply

17  with this order will result in a recommendation to a district judge that the instant action be dismissed,

18  with prejudice, for failure to prosecute, failure to obey a court order, and failure to state a cognizable

19  claim for relief." (ECF No. 7.)  Thus, Plaintiff had adequate warning that dismissal would result from

20  his noncompliance with the Court's order.

21                                      **VI.**

22                        **ORDER AND RECOMMENDATION**

23    The Court has screened Plaintiff's complaint and found that it fails to state a cognizable claim.

24  Plaintiff has failed to comply with the Court's order to file a first amended complaint or respond to the

25  Court's order to show why the action should not be dismissed.  In considering the factors to determine

26  if this action should be dismissed, the Court finds that this action should be dismissed for Plaintiff's

27  failure to state a cognizable claim, failure to obey the August 25, 2020 and October 14, 2020 orders, and

28  failure to prosecute this action.

14

1    Accordingly, it is HEREBY ORDERED that the Clerk of Court is directed to randomly assign a

2  Fresno District Judge to this action.

3    Further, it is HEREBY RECOMMENDED that this action be DISMISSED for Plaintiff's failure

4  to state a claim, failure to comply with a court order, and failure to prosecute.

5    This Findings and Recommendation is submitted to the district judge assigned to this action,

6  pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fourteen **(14) days** of

7  service of this Recommendation, Plaintiff may file written objections to this findings and

8  recommendation with the Court.  Such a document should be captioned "Objections to Magistrate

9  Judge's Findings and Recommendation."  The district judge will review the magistrate judge's Findings

10  and Recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file

11  objections within the specified time may result in the waiver of rights on appeal.

12  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394

13  (9th Cir. 1991)).

14

15  IT IS SO ORDERED.

16  Dated:    **November 3, 2020**

17                                                   UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28